IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| DAVID CRUZ, VALENTIN REYES, | § | NO. 5:16-CV-067-DAE |
| JOHNATHON RYAN, BISHOP | § | |
| ENRIQUE SAN PEDRO OZANAM | § | |
| CENTER, INC., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| vs. | § | |
| | § | |
| GREG ABBOTT, In his Official | § | |
| Capacity as Governor of the State of | § | |
| Texas, STEVEN C. MCCRAW, In his | § | |
| Official Capacity as Director of Public | § | |
| Safety,  CYNTHIA LEON, In her | § | |
| Official Capacity as Member of the | § | |
| Texas Public Safety Commission, | § | |
| FAITH JOHNSON, In her Official | § | |
| Capacity as Member of the Texas | § | |
| Public Safety Commission, MANNY | § | |
| FLORES, In his Official Capacity as | § | |
| Member of the Texas Public Safety | § | |
| Commission, STEVEN P. MACH, In | § | |
| his Official Capacity as Member of the | § | |
| Texas Public Safety Commission, | § | |
| RANDY WATSON, In his Official | § | |
| Capacity as Member of the Texas | § | |
| Public Safety Commission, | § | |
| | § | |
| Defendants. | § | |
| _____ | § | |

ORDER (1) GRANTING MOTION FOR PRELIMINARY INJUNCTION,
AND (2) GRANTING IN PART AND DENYING IN PART
<u>MOTION TO DISMISS</u>

Before the Court is (1) Plaintiffs David Cruz, Valentin Reyes,

Johnathon Ryan, and Bishop Enrique San Pedro Ozanam Center, Inc.'s

(collectively "Plaintiffs") Motion for Preliminary Injunction (Dkt. # 3), and

(2) Defendants Greg Abbott ("Governor Abbott"), Steven C. McCraw, Cynthia

Leon, Faith Johnson, Manny Flores, Steven P. Mach, and Randy Watson's

(collectively "Defendants") Motion to Dismiss Plaintiffs' First Amended

Complaint (Dkt. # 16).  The Court held a hearing on these motions on March 31,

2016.   At the hearing, Nina Perales, Esq., and Jack Salmon, Esq., represented

Plaintiffs, and Adam Bitter, Esq., Angela Colmenero, Esq., and John Duke, Esq.,

represented Defendants.

Upon careful consideration of the arguments asserted in the

supporting and opposing memoranda, as well as the arguments presented at the

hearing, the Court (1) **GRANTS** Plaintiffs' Motion for Preliminary Injunction

(Dkt. # 3), and (2) **GRANTS IN PART** and **DENIES IN PART** Defendants'

Motion to Dismiss (Dkt. # 16).

<u>BACKGROUND</u>

I.     <u>House Bill 11</u>

In March 2015, the Texas Committee on Homeland Security took up the matter of "the smuggling of humans and illegal contraband by transnational gangs and perpetrators of organized crime throughout" Texas's border and throughout the State.  (Dkt. # 17-13 at 4.)  House Bill 11 ("H.B. 11") was introduced in an effort to "increase the presence and opportunity of law enforcement" and give "them various tools to help them do a more effective job of fighting . . . transnational gangs and smugglers."  (<u>Id.</u>)  Formally, H.B. 11 relates "to the powers and duties of the Texas Department of Public Safety [("DPS")], military and law enforcement training, and the investigation, prosecution, punishment, and prevention of certain offenses; creating an offense and increasing a criminal penalty; [and] authorizing fees."  "H.B. 11," 2015 Leg., 84th Sess. (Tex. 2015).  Several hearings regarding H.B. 11 were held in March and April of 2015. (Dkts. ## 17-13, 17-14, 17-17, 17-18.)

Among other provisions, section 14 of H.B. 11 proposed a revision to the State's human smuggling statute—section 20.05 of the Texas Penal Code.[1]  <u>See</u> H.B. 11, § 14 (codified as amended as Tex. Penal Code Ann. § 20.05 (West

---

[1] As originally proposed, the amendment to Tex. Penal Code § 20.05 was contained in Section 10 of H.B. 11.  (<u>See</u> Dkt. # 17-20 at 13.)

2015)).  The proposed amendments to the penal code included the creation of a

new criminal offense—harboring an undocumented alien,[2] as well as narrowing

the existing offense of concealing a person from law enforcement.  (Id.)  In the

course of legislative debate regarding section 14 of H.B. 11, several witnesses

acknowledged at the hearings that the proposed legislation might be subject to

challenge.  For instance, Pastor Sammy Garcia testified that his ministry along the

border would be negatively affected because he would be subject to prosecution

for picking up a person in need and taking him "to service" because he did not

know whether the person was an undocumented alien.  (Dkt. # 17-13 at 71.)

Additionally, Eugene Hildebrandt, a pastor in Austin, Texas, testified that he was

concerned about the statute's language relating to "knowingly" harboring an

undocumented alien because his ministry to the poor did not involve inquiry into a

person's citizenship status.  (Dkt. # 17-14 at 4.)  Another pastor, Lynn Godsey,

testified about her concern that law enforcement officers might target churches

where they know undocumented aliens attend and "sit outside" to arrest violators

of the statute, including those church personnel who "harbor" these undocumented

aliens.  (Id. at 14–15.)

---

[2] The Court uses the term "undocumented alien" to mean a person not lawfully
authorized to be in the United States.  Cf. 8 U.S.C. § 1101(a)(3) ("The term 'alien'
means any person not a citizen or national of the United States.").

In response to these and other concerns, an amendment to section 14 of H.B. 11 was offered, which focused "on an individual's intent to obtain a pecuniary benefit" in a human smuggling activity, such as "concealing, harboring, or shielding that person from detection."  (See Dkt. # 17-14 at 78–79.)  When introducing the amendment, Representative Joe Moody commented that "I think that what we've done here is make sure that the folks we're targeting with this statute are the ones that we're going to get.  I think that's everybody's goal.  I think we don't want to have unintended consequences."  (Id. at 79.)  The substitution to the proposed bill was adopted without objection.  (Id. at 80.)  Subsequently, the Committee unanimously approved sending the amended bill to the full House of Representatives.  (Id. at 81.)

In May 2015, an amended version of H.B. 11, not significantly affecting the language proposed in section 14, was eventually adopted by both the House and the Senate.  On June 9, 2015, Governor Greg Abbott signed H.B. 11 into law.  In signing H.B. 11, Governor Abbott commented that Texas "cannot be naïve to the threat posed by drug cartels and transnational gangs.  And Texas will not sit idly by while the federal government fails to do its job and secure the border."  (Dkt. # 4 at 136.)  Governor Abbott further commented "[t]he issues exist in the first place because we have a failed federal government that has refused to address the issues to tackle those problems. . . . Those are national, federal-based

5

issues that we demand the United States federal government address and solve.
Texas is doing what it can do by passing this border security plan." (Dkt. # 17-7 at
3.) H.B. 11 became effective on September 1, 2015. See H.B. 11. Since its
enactment, DPS has enforced section 14's criminal provisions at least once. (See
Dkt. # 4 at 145–46.)

II.    Plaintiffs' Complaint

On January 24, 2016, Plaintiffs filed suit against Defendants in this
Court. (Dkt. # 1.) Plaintiffs' amended complaint challenges sections 14(a)(2),
15(a), and 16(a)(17) of H.B. 11 ("H.B. 11's harboring provisions").[3] (Dkt. # 9.)
As discussed above, section 14(a)(2) states that "[a] person commits an offense if
the person, with the intent to obtain a pecuniary benefit, knowingly . . . encourages
or induces a person to enter or remain in this country in violation of federal law by
concealing, harboring, or shielding that person from detection." H.B. 11,
§ 14(a)(2); Tex. Penal Code § 20.05. Section 15(a) addresses the "continuous
smuggling of persons," stating that "a person commits an offense if, during a
period that is 10 or more days in duration, the person engages two or more times in
conduct that constitutes an offense under" section 14. H.B. 11, § 15(a); Tex. Penal
Code § 20.06. Section 16(a)(17) states that "[a] person commits an offense if, with
the intent to establish, maintain, or participate in a combination or in the profits of

---

[3] Plaintiffs do not challenge the whole of H.B. 11, only these stated harboring
provisions.

6

a combination or as a member of a criminal street gang, the person commits or conspires to commit . . . any offense [under section 14 or 15]."  H.B. 11, § 16(a)(17); Tex. Penal Code § 71.02(a).

Plaintiffs argue that H.B. 11's harboring provisions violate the Supremacy Clause, Article VI, Clause 2 of the United States Constitution. Plaintiffs contend the harboring provisions "attempt to regulate matters that are exclusively reserved to the federal government, because they operate in a field over which Congress has exercised exclusive authority, and because they conflict and interfere with the implementation and enforcement of federal laws and regulations."  (Dkt. # 9 at 15.)  Plaintiffs also attack H.B. 11's harboring provisions on the grounds that they violate both the Due Process Clause and the Equal Protection Clause of the 14th Amendment of the U.S. Constitution.  (Id. at 15.)

On January 25, 2016, Plaintiffs moved for a preliminary injunction. (Dkt. # 3.)  Defendants filed a response to the motion on February 26, 2016 (Dkt. # 17); Plaintiffs filed a reply on March 11, 2016 (Dkt. # 20.)  In responding to Plaintiff's motion on February 26, 2016, Defendants simultaneously moved to dismiss Plaintiffs' amended complaint.  (Dkt. # 16.)  Plaintiffs filed a response on March 12, 2016 (Dkt. # 22); Defendants filed a reply on March 23, 2016 (Dkt. # 26.)  The pending motions are addressed below.

III.   Legal Standards

    A.   Preliminary Injunction Standard

        The grant of injunctive relief is an extraordinary remedy which requires the movant to unequivocally show the need for its issuance.  Opulent Life Church v. City of Holly Springs, Miss., 697 F.3d 279, 288 (5th Cir. 2012); Valley v. Rapides Parish Sch. Bd., 118 F.3d 1047, 1050 (5th Cir. 1997).  A preliminary injunction should not be granted unless the movant demonstrates by a clear showing: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm if the injunction is not granted; (3) that the threatened injury outweighs any harm that may result from the injunction to the non-movant; and (4) that the injunction will not undermine the public interest. Lindsay v. City of San Antonio, 821 F.2d 1103, 1107 (5th Cir. 1987); Valley, 118 F.3d at 1051.  However, even when a movant establishes each of the four requirements described above, the decision whether to grant or deny a preliminary injunction remains within the Court's discretion, and the decision to grant a preliminary injunction is treated as the exception rather than the rule.  Miss. Power & Light Co. v. United Gas Pipe Line Co., 760 F.2d 618, 621 (5th Cir. 1985).

    B.   Motion to Dismiss Standards

        Defendants move to dismiss Plaintiffs' claims under both Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  (Dkt. # 16.)

8

1.    Fed. R. Civ. P. 12(b)(1)

Pursuant to Federal Rule of Civil Procedure 12(b)(1), a defendant may move to dismiss a complaint for lack of subject-matter jurisdiction.  The plaintiff, as the party asserting jurisdiction, bears the burden of proving that subject-matter jurisdiction exists.  Choice Inc. of Tex. v. Greenstein, 691 F.3d 710, 714 (5th Cir. 2012).  A district court may dismiss for lack of subject-matter jurisdiction on any one of the following bases:  "(1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." Voluntary Purchasing Grps., Inc. v. Reilly, 889 F.2d 1380, 1384 (5th Cir. 1989). However, "a motion to dismiss for lack of subject matter jurisdiction should be granted only if it appears certain that the plaintiff cannot prove any set of facts in support of his claim that would entitle plaintiff to relief."  Ramming v. United States, 281 F.3d 158, 161 (5th Cir. 2001).

2.    Fed. R. Civ. P. 12(b)(6)

Federal Rule of Civil Procedure 12(b)(6) authorizes dismissal of a complaint for "failure to state a claim upon which relief can be granted."  Review is limited to the contents of the complaint and matters properly subject to judicial notice.  See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007).  In analyzing a motion to dismiss for failure to state a claim, "[t]he court

accepts 'all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.'" In re Katrina Canal Breaches Litig., 495 F.3d 191, 205 (5th Cir. 2007) (quoting Martin K. Eby Constr. Co. v. Dallas Area Rapid Transit, 369 F.3d 464, 467 (5th Cir. 2004)).  To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 663 (2009).

A complaint need not include detailed facts to survive a Rule 12(b)(6) motion to dismiss.  See Twombly, 550 U.S. at 555–56.  In providing grounds for relief, however, a plaintiff must do more than recite the formulaic elements of a cause of action.  See id. at 556–57.  "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions," and courts "are not bound to accept as true a legal conclusion couched as a factual allegation." Iqbal, 556 U.S. at 678 (internal quotations and citations omitted). Thus, although all reasonable inferences will be resolved in favor of the plaintiff, the plaintiff must plead "specific facts, not mere conclusory allegations." Tuchman v. DSC Commc'ns Corp., 14 F.3d 1061, 1067 (5th Cir. 1994); see also

10

Plotkin v. IP Axess Inc., 407 F.3d 690, 696 (5th Cir. 2005) ("We do not accept as true conclusory allegations, unwarranted factual inferences, or legal conclusions.").

IV.   Discussion

    A.   Standing

        Defendants argue that Plaintiffs lack standing to sue because they cannot demonstrate the existence of an imminent injury-in-fact.  (Dkt. # 16 at 21.) Defendants assert that Plaintiffs have failed to properly allege that they will engage in any future conduct prohibited by the statute.  (Id.)  As such, Defendants contend that Plaintiffs' complaint must be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(1).  (Id.)

        Under section 2 of Article III of the Constitution, federal courts have jurisdiction over a dispute "only if it is a case or controversy.  This is a bedrock requirement."  Raines v. Byrd, 521 U.S. 811, 818 (1997); see also Miss. State Democratic Party v. Barbour, 529 F.3d 538, 544 (5th Cir. 2008).  To have standing, "the plaintiff [must have] personally suffered some actual or threatened injury that can fairly be traced to the challenged action and is redressable by the courts."  Doe v. Tangipahoa Parish Sch. Bd., 494 F.3d 494, 496 (5th Cir. 2007).  A plaintiff must prove, and not merely assert, standing to sue in order to meet the case or controversy requirement of Article III.  Id. at 496–97.

To establish standing, "a plaintiff must show: (1) [he] has suffered, or imminently will suffer, a concrete and particularized injury-in-fact; (2) the injury is fairly traceable to the defendant's conduct; and (3) a favorable judgment is likely to redress the injury." Hous. Chronicle Publ'g Co. v. City of League City, Tex., 488 F.3d 613, 617 (5th Cir. 2007); see FW/PBS, Inc. v. Dallas, 493 U.S. 215, 231 (1990).

"Beyond the constitutional requirements, the federal judiciary has also adhered to a set of prudential principles that bear on the question of standing." Valley Forge Christian Coll. v. Ams. United for Separation of Church and State, 454 U.S. 464, 474 (1982).  A plaintiff must assert his own legal rights and "cannot rest his claim to relief on the legal rights or interests of third parties." Id.  The Court may not adjudicate "abstract questions of wide public significance which amount to generalized grievances." Id. at 475 (quotation omitted).  Finally, the plaintiffs' complaint must fall within "the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." Id. (quotation omitted).  "Where a party champions his own rights, and where the injury alleged is a concrete and particularized one which will be prevented or redressed by the relief requested, the basic practical and prudential concerns underlying the standing doctrine are generally satisfied when the constitutional requisites are met." Duke Power Co. v. Carolina Envtl. Study Grp., 438 U.S. 59, 80–81 (1978).

Additionally, every plaintiff need not have standing to assert every claim.  The Court has jurisdiction over a claim if at least one plaintiff has standing to assert the claim.  See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 264 (1977).

Plaintiffs, who invoked the Court's jurisdiction, have the burden of establishing these elements.  Duke Power Co., 438 U.S. at 80–81.  "Since they are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof."  Lujan v. Defs. of Wildlife, 504 U.S. 555, 561 (1992).

1.   The Individual Plaintiffs

The individual plaintiffs in this case are David Cruz and Valentin Reyes ("individual plaintiffs").  (Dkt. # 9.)  Plaintiff Cruz owns two single-family homes and two duplexes in San Antonio, Texas.  (Id. at 2.)  Cruz rents these properties to persons on a monthly basis and receives monthly income from these properties totaling over $3,000.  (Id.)  According to Plaintiffs, Cruz does not "require his tenants to reveal their citizenship or immigration status before occupying his properties, and he does not know the immigration status of his present tenants."  (Id. at 3.)  Similarly, Plaintiff Reyes owns a single-family home in Farmers Branch, Texas that he rents out on a monthly basis.  (Id.)  Plaintiffs

allege that Reyes "has rented his property in the past to immigrants and plans to continue to do so for the foreseeable future." (Id.)  Reyes also does not require his tenants to reveal their citizenship or immigration status prior to leasing his property to them.  (Id. at 4.)

Defendants attack the individual plaintiffs' standing on the basis that neither Cruz nor Reyes have a credible threat of prosecution under H.B. 11's harboring provisions because the facts alleged in their complaint acknowledge that they have not knowingly encouraged or induced undocumented aliens to remain in the United States in violation of federal law.  (Dkt. # 16 at 22.)  Defendants argue that "[w]ithout the requisite mens rea to fall within reach of the statute, Cruz's and Reyes's purported injuries are far too speculative." (Id.)  Defendants further contend that the individual plaintiffs lack standing because they have not alleged that they have done the prohibited activities with the intent to obtain a pecuniary benefit.  (Id.)  Because they cannot demonstrate the required elements in order to be held criminally liable under the statute, then Defendants argue that the individual plaintiffs have no standing.  (Id.)

As stated earlier, section 14(a) of H.B. 11 requires that a person "knowingly . . . encourage[] or induce[] a person to enter or remain in this country in violation of federal law by concealing, harboring, or shielding that person from detection." H.B. 11 § 14(a)(2).  Section 6.03(b) of the Texas Penal Code states

that "[a] person acts knowingly, or with knowledge, with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist."  Tex. Penal Code § 6.03(b). The statute also states that "[a] person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result."  Id.

The individual plaintiffs have demonstrated the requisite mens rea under the penal code to result in a credible threat of prosecution under H.B. 11's harboring provisions.  First, although Reyes does not inquire into his tenants' immigration status when leasing his property, Reyes states that he learned that "one of [his] tenants was undocumented while a family was renting from" him and then later as the family became comfortable with him, "the wife told me that her husband was undocumented."  (Dkt. # 22-1 at 43.)  Reyes states that upon learning of their immigration status, he "did not terminate the lease or try to evict the family."  (Id.)  Reyes "expect[s] to rent to undocumented tenants in the future." (Id.)  Reyes states that he will have to change his business practices if forced to comply with H.B. 11's harboring provisions, including inter alia, losing potential business income if he starts "asking prospective tenants to prove their immigration status" because they "will be deterred from seeking to rent [his] property out of

fear that [he] will reject them as tenants or report them to immigration authorities." (<u>Id.</u> at 44.)

Similarly, Cruz "learned that one of [his] tenants was undocumented when he told [him] that he had trouble finding a job because of his undocumented status," but that Cruz "did not terminate the lease or try to evict the tenant."  (Dkt. # 22-1 at 51.)  In fact, Cruz states that as his tenants become comfortable with him, they often reveal their immigration status as undocumented aliens, but he doesn't evict them or terminate their lease.  (<u>Id.</u>)  Cruz, like Reyes, expects to rent his properties to undocumented aliens in the future.  (<u>Id.</u> at 52.)  Cruz would also have to significantly change his business practices, which would be burdensome and time-consuming, in order to screen tenants for their immigration status.  (<u>Id.</u>)  He believes any inquiry into their immigration status would also be an invasion of their privacy and that they would be deterred from renting his properties out of fear of rejection or his reporting them to immigration officials.  (<u>Id.</u>)

On these facts, the individual plaintiffs, Cruz and Reyes, have demonstrated "a serious[] interest[] in acting contrary to a statute."  <u>Barbour</u>, 529 F.3d at 545 n.8 (internal quotations omitted).  "[I]t is sufficient for standing purposes that the plaintiff intends to engage in a 'course of conduct arguably affected with a constitutional interest' and that there is a credible threat that the provision will be invoked against the plaintiff."  <u>Valle del Sol</u>, 732 F.3d at 1015

16

(quoting Ariz. Right to Life Political Action Comm. v. Bayless, 320 F.3d 1002,

1006 (9th Cir. 2003)).  Cruz and Reyes's statements clearly indicate their intention

of concealing, harboring, or shielding their tenants who are undocumented aliens

from detection.  See Valle del Sol, 732 F.3d at 1017.  Furthermore, Cruz and

Reyes's collection of monthly rent from their undocumented tenants meets H.B. 11

§ 14's requirement that their actions were done "with the intent to obtain a

pecuniary benefit."  These actions fall squarely within the plain language of H.B.

11's harboring provisions.

Furthermore, Cruz and Reyes have presented evidence that

enforcement of H.B. 11's harboring provisions would add significant intrusive and

time-consuming burdens and harm to their ability to lease their properties.  These

burdens include learning immigration classifications, reviewing immigration

paperwork, and possibly hiring an immigration attorney to review future tenants'

immigration status, all of which may result in a loss of business—and therefore

rental income—from prospective tenants.  (Dkt. # 22-1 at 44–45, 52–53.)  The

Court does not need to resolve any disputes over the exact measure of harm to find

that the individual plaintiffs have satisfied their burden to show an injury-in-fact,

as the statute's "validity could be assessed without knowing the precise means and

expense of compliance.'"   Villas at Parkside Partners v. City of Farmers Branch,

Tex., 701 F. Supp. 2d 835, 850 (N.D. Tex. 2010), aff'd, 726 F.3d at 524 (quoting

520 S. Mich. Ave. Assocs. v. Devine, 433 F.3d 961, 963 (7th Cir. 2006) (en banc)).

Accordingly, Cruz and Reyes have demonstrated a realistic threat of injury as a

result of H.B. 11's harboring provisions and they have sufficiently alleged

standing.[4]  And, because Cruz and Reyes have standing to assert their claims, then

the plaintiff organizations do as well.  See Vill. of Arlington, Heights, 429 U.S. at

264 n.9 (deciding that since one plaintiff had standing, then the Court "need not

consider whether the other individual and corporate plaintiffs have standing to

maintain the suit").  Still, to be thorough, the Court will examine the plaintiff

organizations' standing to bring their claims.

### 2.   The Plaintiff Organizations

The plaintiff organizations in this case are Johnathon Ryan, the

Executive Director of the Refugee and Immigrant Center for Education and Legal

Services ("RAICES"), and the Bishop Enrique San Pedro Ozanam Center, Inc.

("the Ozanam Center") (collectively "plaintiff organizations").  (Dkt. # 9.)

RAICES provides free and low-cost legal services to underserved undocumented

children, families, and refugees in Central and South Texas.  (Id. at 4.)  RAICES

also operates two temporary shelters that provide post-relief services to

undocumented aliens leaving detention centers.  (Id.)  In his role as Director of

---

[4] The Court by its ruling does not condone Cruz and Reyes's leasing practices; the
issue before the Court is not the propriety of their activities, but whether Cruz and
Reyes fall within the reach of H.B. 11's harboring provisions.

RAICES, Plaintiff Ryan "provides shelter to immigrant women and children who are not authorized to be present in the U.S. and lack lawful immigration status." (Id.)  According to Plaintiffs, Ryan also provides food, clothing, and shelter to these same persons.  (Id.)  In return, Plaintiffs allege that the undocumented aliens who stay at RAICES's temporary shelters help out with daily maintenance and cleaning chores.  (Id.)

Plaintiff Ryan also works at the RAICES office in downtown San Antonio, Texas, where attorneys and other legal staff provide legal services to undocumented aliens on a pro bono or reduced-fee basis.  (Dkt. # 9 at 5.) According to Plaintiffs, because there is a high demand for these legal services, prospective clients must line up and wait outside the doors of the RAICES office. (Id.)  Because of this, Plaintiffs argue that these undocumented aliens are "easily visible to state and local law enforcement while they wait outside."  (Id.)

The Ozanam Center is a homeless shelter in Brownsville, Texas. (Dkt. # 9 at 6.)  Like the services provided by RAICES, the Ozanam Center "provides temporary shelter and transitional housing to individuals and families regardless of sex, race, color, creed, national origin, and immigration status."  (Id.) Guests sheltered at the Ozanam Center are either self-referred or referred by local and federal law enforcement agencies, including the United States Immigration and Customs Enforcement ("ICE").  (Id.)  These guests, according to Plaintiffs, include

undocumented individuals, families, and expectant mothers who have been

released from ICE detention centers and are currently in removal proceedings.

(Id.)  Plaintiffs contend that the Ozanam Center does not inquire into their guests'

immigration or citizenship status and "[o]n information and belief, many guests are

not authorized to be present in the United States and lack lawful immigration

status."  (Id.)  Like the RAICES shelters, guests at the Ozanam Center contribute to

its maintenance by providing daily chores, including cleaning, preparing meals and

taking out the trash.  (Id. at 7.)

Defendants contend that the plaintiff organizations do not have

standing because H.B. 11 does not apply to them.  (Dkt. # 16 at 22.)  They argue

that the actus reus of H.B. 11's harboring provisions requires that the unlawful acts

of harboring or concealing an undocumented alien be committed "with the intent to

obtain a pecuniary benefit."  (Id.)  Because the legislature amended section 14 of

H.B. 11 to exclude from criminal prosecution organizations like RAICES and the

Ozanam Center, then Defendants argue that they have failed to demonstrate the

existence of a concrete, as opposed to purely speculative, injury-in-fact for

purposes of standing.  (Id. at 23.)

An organization may have standing in its own right or based on the

rights of its members.  Warth v. Seldin, 422 U.S. 490, 511 (1975).  For an

organization to be able to sue in its own right, a court must consider whether an

organizational plaintiff has "alleged such a personal stake in the outcome of the controversy as to warrant [its] invocation of federal-court jurisdiction." <u>Havens Realty Corp. v. Coleman</u>, 455 U.S. 363, 378–79 (1982) (quotation omitted).  "[A]n organization may establish injury in fact by showing that it [will] divert[] significant resources to counteract the [challenged statute]; hence, the defendant's conduct [in enacting the statute] significantly and 'perceptibly impaired' the organization's ability to provide its 'activities—with the consequent drain on the organization's resources.'" <u>NAACP v. City of Kyle, Tex.</u>, 626 F.3d 233, 238 (5th Cir. 2010) (quoting <u>Havens</u>, 455 U.S. at 379).  "Such injury must be concrete and demonstrable." <u>Id.</u>

   Contrary to Defendants' contention, Plaintiff Ryan and the Ozanam Center face a credible threat of prosecution.  Both RAICES and the Ozanam Center provide shelter to undocumented aliens on a continuous basis.  While the Ozanam Center does not ask individuals who seek shelter their immigration status, "after a day or two, as they become comfortable with the staff, many talk about the fact that they are undocumented."  (Dkt. # 22-1 at 62.)  As a result, the shelter "currently provides, and regularly provides, shelter to undocumented individuals." (<u>Id.</u>)  In exchange for shelter, residents at the Ozanam Center "perform work to assist in the operation of the shelter; this work can be valued in money, including cleaning, cooking, directing other residents and maintenance."  (<u>Id.</u> at 63.)

Additionally, the Ozanam Center receives a monthly stipend from the Catholic Diocese of Brownsville, Texas.  (Id.)  Similarly, Plaintiff Ryan, through RAICES, provides shelter to undocumented aliens.  (Dkt. # 4 at 157.)  Ryan also provides legal services to undocumented aliens through RAICES downtown office. Individuals who receive shelter at RAICES contribute to the shelter's maintenance "by performing chores including sweeping the floors, making beds, doing laundry, and taking out the trash."  (Id.)

Because the work the undocumented aliens provide in exchange for shelter at both RAICES and the Ozanam Center may be reduced to a monetary value, the organizational plaintiffs have a pecuniary interest in continued sheltering of undocumented individuals.  See Black's Law Dictionary (9th ed. 2009) (defining "pecuniary" as "[o]f or relating to money; monetary").  Additionally, the Ozanam Center receives a monthly stipend for its work with individuals in need, including those who are undocumented aliens.  RAICES, without maintenance help, and the Ozanam Center, without maintenance help and a monthly stipend, would not likely be able to afford to operate.  In such case, Plaintiff Ryan and the Ozanam Center have sufficiently alleged that they meet H.B. 11 § 14's requisite that their actions were done "with the intent to obtain a pecuniary benefit."

Furthermore, both RAICES and the Ozanam Center will have to adopt costly measures to be in compliance with H.B. 11's harboring provisions. The Ozanam Center will not only have to change the mission of the organization— "to serve the needy regardless of immigration status"—but it will also have to change its business practices in order to screen for an individual's immigration status. (Dkt. # 22-1 at 64.)  Changing business practices to screen for "immigration status would increase the time it takes the Center to conduct intakes, drain [its] very limited administrative resources and reduce [its] ability to serve the shelter's residents."  (Id.)  Similarly, Plaintiff Ryan would no longer be able to operate RAICES because of its specific purpose of providing shelter and aid to undocumented aliens.  This realistic injury "significantly and perceptibly impair[s] the organization's ability to provide its activities."  NAACP, 626 F.3d at 238 (quotation omitted).  Accordingly, the plaintiff organizations, in addition to the individual plaintiffs, have sufficiently alleged standing in their own right.[5]

---

[5] The Court notes the individual plaintiffs and plaintiff organizations in this case are comparable to the plaintiffs in cases in other circuits challenging similar anti-harboring laws, as discussed below; notably, the Ninth and Eleventh Circuits held that the individual plaintiffs and plaintiff organizations in those cases had standing to challenge the anti-harboring laws at issue there.  See Valle del Sol, 732 F.3d at 1017–19 (holding that a pastor who "provides shelter to persons who seek sanctuary in her church" and organizations who provide services to homeless and undocumented aliens had standing); Ga. Latino Alliance for Human Rights ("GLAHR") v. Governor of Ga., 691 F.3d 1250, 1258–60 (11th Cir. 2012) (ruling that civil immigration attorney who provides services including transportation and

3.    <u>Threatened Injury</u>

Defendants also argue that Plaintiffs' fears of future enforcement are not credible and cannot confer standing.  (Dkt. # 16 at 23.)  Defendants assert that Plaintiffs have not offered any evidence that they have been, or are currently being, investigated by any state or local law enforcement agency for violations of H.B. 11's harboring provisions.  (<u>Id.</u>)

Although a plaintiff "must demonstrate a realistic danger of sustaining a direct injury as a result of a statute's operation or enforcement," a plaintiff "does not have to await until the consummation of threatened injury to obtain preventative relief."  <u>Valle del Sol Inc. v. Whiting</u>, 732 F.3d 1006, 1015 (9th Cir. 2013), <u>cert. denied</u> __U.S.__, 134 S.Ct. 1876, 188 L.Ed. 2d 911 (2014) (quoting <u>Babbitt v. United Farm Workers</u>, 442 U.S. 289, 298–99 (1979)).  As such, neither Reyes nor Cruz must wait until prosecution to challenge any of H.B. 11's harboring provisions.  <u>Id.</u>  "When the plaintiff has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder," he should not wait for criminal prosecution to seek relief.  <u>Babbitt</u>, 442 U.S. at 298.

---

legal advice, as well as organization that provides services to undocumented aliens had standing).

At the hearing on Plaintiffs' motion for preliminary injunction and Defendants' motion to dismiss, the Court asked Defendants for an unequivocal answer from the Attorney General as to whether any of the Plaintiffs' conduct fell within the ambit of section 20.05(a)(2) of the Texas Penal Code. The Court gave Defendants five days to submit their answer in a supplemental brief. On April 4, 2016, Defendants filed a declaration of Defendant McCraw, who stated that he was the Executive Director of DPS and the Governor's Homeland Security Advisor. (Dkt. # 31-1 at 1.) In this position, according to McCraw, he oversees commissioned officers of DPS, including State Troopers, Rangers, and Special Agents. (Id. at 1–2.) McCraw further stated that he reviewed certain documents in this case and that "[b]ased on the facts alleged by [Plaintiffs] . . . , DPS officials would not investigate, file criminal charges, or otherwise engage in enforcement activity pursuant to the present version of Section 20.05 of the Texas Penal Code against individuals engaged in such conduct." (Id. at 2.)

McCraw's declaration, however, fails to unequivocally respond to the Court's request for a binding interpretation as to the scope of the current version of section 20.05 of the Texas Penal Code and whether it applies to Plaintiffs. First, McCraw's statement does not bind county prosecutors or local law enforcement officers who may choose to enforce section 20.05 even if certain state law enforcement officers would not. Likewise, McCraw's statements do not purport to

25

bind his codefendants—the State of Texas, Governor Abbott, or the other Defendants who are members of the Texas Public Safety Commission.  Second, as discussed above, the plain language of section 20.05 clearly includes the conduct described by both the individual plaintiffs and the plaintiff organizations.

Furthermore, state police have already arrested individuals for violation of H.B. 11's harboring provisions.  (Dkt. # 4 at 145.)  Indeed, more arrests are likely to follow in light of Governor Abbott's award of grants totaling more than $4 million to border security actions and his indefinite deployment of the Texas National Guard in the Rio Grande Valley.  (Id. 149–50.)  Defense counsel's statements at oral argument also make clear that the state of Texas intends to enforce H.B. 11's harboring provisions.  Accordingly, Defendants' arguments regarding whether Plaintiffs face a credible threat of prosecution are without merit.

### 4.   Governor Abbott

Defendants next contend that even if Plaintiffs could demonstrate purported injuries, they are not traceable to, nor likely to be redressed by, the relief sought against Governor Abbott.   (Dkt. # 16 at 24.)   Defendants assert that without any showing of redressability or traceability by Plaintiffs, their "suit amounts to nothing more than an impermissible request for an advisory opinion." (Id. at 25.)  In such case, Defendants argue that Governor Abbott is not a proper

defendant and that Plaintiffs cannot establish that he has any special enforcement authority over H.B. 11's harboring provisions.  Without any such showing, Defendants contend that Plaintiffs lack standing to assert their claims against Governor Abbott.

In response, Plaintiffs argue that Governor Abbott has a direct role in the enforcement of H.B. 11's harboring provisions because he appoints the members of the Texas Public Safety Commission ("the Commission") and also supervises that agency.  (Dkt. # 22-1 at 27.)  Because the Commission oversees and adopts the rules that DPS and state law enforcement enforce, Plaintiffs contend that Governor Abbott is a proper Defendant.  (Id.)  Additionally, Plaintiffs assert that Governor Abbott's awarding of grant money to state and local law enforcement agencies, including funding to the Border Prosecution Unit created by H.B. 11, evidences his direct connection to enforcement of H.B. 11's harboring provisions.  (Id. at 29.)  Furthermore, Plaintiffs contend that Governor Abbott has publicly and explicitly expressed an interest in protecting the citizens of Texas, "with or without the federal government's help."  (Id.)

A plaintiff satisfies the redressability requirement of standing by showing it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  League of United Latin Am. Citizens, Dist. 19 v. City of Boerne, 659 F.3d 421, 431 (5th Cir. 2011).  Still, a plaintiff

27

"need not show that a favorable decision will relieve his <u>every</u> injury," but only that such a decision will "relieve a discrete injury to himself."  <u>K.P. v. LeBlanc</u>, 627 F.3d 115, 123 (5th Cir. 2010) (citing <u>Larson v. Valente</u>, 456 U.S. 228, 243 n. 15 (1982)).

In <u>Okpalobi v. Foster</u>, the Fifth Circuit ruled on whether the Governor and Attorney General had power to redress the injury alleged by the plaintiffs in that case.  244 F.3d 405 (5th Cir. 2001).  The Fifth Circuit determined that the Governor and Attorney General had no power to enforce the challenged statute, which was solely enforceable by private litigants.  <u>Id.</u> at 428–29.  Based on this, the Fifth Circuit held that the Governor and Attorney General had no power to redress the alleged injury.  <u>Id.</u>  In a concurring opinion, Judge Higginbotham opined that the plaintiffs in that case failed to meet the causation and redressability requirements because "[t]he defendants could not threaten enforcement of the targeted state law; they lack the authority to do so."  <u>Id.</u> at 431.  Both officials in that case did not have "any duty or ability to do <u>anything</u>."  <u>Id.</u> at 427 (emphasis in original).

Unlike <u>Okpalobi</u>, Plaintiffs here have demonstrated that Governor Abbott has at least some enforcement authority of H.B. 11 given his supervisory role over the Committee and his funding and public statements regarding H.B. 11's enactment.  <u>Cf.</u> <u>Veasey v. Perry</u>, 29 F. Supp. 3d 896, 924 (S.D. Tex. 2014) ("The

Court determines that Governor Perry has some connection with the enforcement of S.B. 14 sufficient to make him a proper Defendant.")  An injunction of his enforcement would likely redress a discrete injury to Plaintiffs by prohibiting his enforcement of H.B. 11's harboring provisions.  See K.P., 627 F.3d at 123. Accordingly, the Court finds that based on the facts alleged in the amended complaint, Plaintiffs have standing to assert their claims against Governor Abbott.

> B.   Right of Action

Defendants also move to dismiss on the ground that Plaintiffs lack a right of action to support their preemption claims.  (Dkt. # 16 at 27.)  Specifically, Defendants argue that Plaintiffs must demonstrate not only federal subject matter jurisdiction to bring their claims under the Supremacy Clause,[6] but they must also demonstrate that they have a right of action to do so.  (Id. at 27–28.)  Defendants contend that Plaintiffs have neither a private, equitable, or statutory right of action to bring their preemption claims.  (Id. at 27–34.)

While Plaintiffs do not have a private right of action under the Supremacy Clause to bring their preemption claims, they may, contrary to Defendants' contention, bring their suit in equity to enjoin an unconstitutional action.  The Supreme Court recently held that "[t]he ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of

---

[6] Defendants concede that they "do not quibble with the fact that the case 'arises under' the 'Constitution.'"  (Dkt. # 16 at 28 (citing U.S. Const. art. III, § 2).)

equity, and reflects a long history of judicial review of illegal executive action,

tracing back to England."  Armstrong v. Exceptional Child Ctr., Inc., __U.S.__,

135 S.Ct. 1378, 1384, 191 L.Ed. 2d 471 (2015).  Therefore, it is a "judge-made"

equitable remedy, and it does not "rest[] upon an implied right of action contained

in the Supremacy Clause."  Id.  Accordingly, Plaintiffs have a right of action in

equity to bring their claims under the Supremacy Clause against Defendants.

C.      Preemption

In support of a preliminary injunction, Plaintiffs contend that

H.B. 11's harboring provisions are unconstitutional because they violate the

Supremacy Clause of the United States Constitution.  See U.S. Const. art. VI, cl. 2.

Plaintiffs contend that the harboring provisions intrude in a field occupied by the

federal government and conflict with the purposes of federal immigration statutes.

(Dkt. # 4 at 7.)  Plaintiffs further argue that because they are likely to prevail on

their preemption claim, and because they satisfy the other requirements for a

preliminary injunction, this Court should enjoin Defendants from enforcing

section 14(a)(2) of H.B. 11 during the pendency of this suit.[7]  (Id.)

Defendants respond that "[t]his case is not about immigration" and it

is not "about the State of Texas trying to intrude on an area of regulation controlled

---

[7] Plaintiffs further ask the Court to enjoin enforcement of H.B. 11's other
harboring provisions, sections 15(a) and 16(a)(17), to the extent they incorporate
section 14(a)(2).  (Dkt. # 4 at 26.)

by the federal government."  (Dkt. # 17 at 8.)  Defendants instead assert that H.B.

11 is about "protecting unauthorized aliens from human smugglers."  (Id.)

Defendants argue that Plaintiffs do not have a likelihood of success on the merits

because they cannot demonstrate that federal law preempts the challenged H.B. 11

provisions.  (Id. at 22.)  Defendants further contend that Plaintiffs cannot show any

irreparable harm because they cannot demonstrate that they will be harmed by any

provision of H.B. 11.  (Id.)

   In accordance with the Supremacy Clause, federal law "shall be the

supreme Law of the Land; and the Judges in every state shall be bound thereby,

any Thing in the Constitution or Laws of any State to the Contrary

notwithstanding."  U.S. Const. art. VI, cl. 2.  The Supreme Court has ruled that "in

the absence of an express preemption provision, a state or local law may be

required to 'give way to federal law' under at least two circumstances: field and

conflict preemption."  Villas at Parkside Partners v. City of Farmers Branch, Tex.,

726 F.3d 524, 528 (5th Cir. 2013) (en banc) (quoting Arizona v. United States,

__U.S.__, 132 S.Ct. 2492, 2501, 183 L.Ed. 2d 351 (2012)).

   "First, states and localities may not 'regulat[e] conduct in a field that

Congress, acting within its proper authority, has determined must be regulated by

its exclusive governance.'"  Villas at Parkside, 726 F.3d at 528 (quoting Arizona,

132 S.Ct. at 2501).  "The intent to displace state law altogether can be inferred

31

from a framework of regulation 'so pervasive . . .that Congress left no room for the States to supplement it' or where there is a 'federal interest . . . so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.'" Arizona, 132 S.Ct. at 2501 (quoting Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230 (1947)).

      "Second, state and local laws are preempted 'when they conflict with federal law.'" Villas at Parkside, 726 F.3d at 528 (quoting Arizona, 132 S.Ct. at 2501). "This includes cases where 'compliance with both federal law and state regulations is a physical impossibility,' and those instances where the challenged law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" Arizona, 132 S.Ct. at 2501 (quoting Hines v. Davidowitz, 312 U.S. 52, 67 (1941)). "What is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects." Id. (quoting Crosby v. Nat'l Foreign Trade Council, 530 U.S. 363, 372 (2000)). When conducting a preemption analysis, a court must "assume that 'the historic police powers of the States' are not superseded 'unless that was the clear and manifest purpose of Congress.'" Id. (quoting Rice, 331 U.S. at 230).

      However, a court should start a preemption analysis with a presumption against preemption. Wyeth v. Levine, 555 U.S. 555, 565 (2009).

Such a presumption is strong when Congress has legislated matters in areas where the states have traditionally occupied.  Id.  Nevertheless, the presumption is not strong when the states have not traditionally legislated, especially in areas which are "inherently federal in character."  Buckman Co. v. Plaintiffs' Legal Comm., 531 U.S. 341, 347 (2001).

      1.   Field Preemption

Plaintiffs argue that section 14(a)(2) is field preempted because Congress intended to preempt state alien harboring laws through a complete, harmonious set of standards sanctioning individuals who harbor certain aliens. (Dkt. # 4 at 12.)  Specifically, Plaintiffs argue that 8 U.S.C. § 1324 occupies the entire field of alien harboring regulation and that "[b]y delineating authority in this manner, Congress left no room for additional state regulation."  (Id. at 12–16.) Because Congress has occupied the entire field of alien harboring regulation, Plaintiffs contend that H.B. 11's harboring provisions are preempted by the Supremacy Clause.  (Id. at 16.)

Defendants, on the other hand, argue that Plaintiffs have failed to establish that the provisions which prohibit harboring unauthorized aliens in § 1324 operate to preclude similar state laws on the subject.  (Dkt. # 17 at 28.) Defendants further contend that, even if there is a field of alien harboring

regulation in which the State cannot operate, the state of Texas has not legislated in that field in regard to H.B. 11's harboring provisions.  (Id.)

Under § 1324, "[i]t is a federal felony for any person, 'knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of federal law,' to 'conceal[], harbor[], or shield[] from detection . . . such alien in any place, including any building.'"  Villas at Parkside, 726 F.3d at 529 (quoting 8 U.S.C. § 1324(a)(1)(A)(iii)).  By enacting this provision, Congress "intended to broadly proscribe any knowing or willful conduct fairly within any of these terms that tends to substantially facilitate an alien's remaining in the United States illegally . . . ."  United States v. Rubio-Gonzales, 674 F.2d 1067, 1073 n.5 (5th Cir. 1982).  The Fifth Circuit has interpreted the statutory phrase "'harbor, shield, or conceal'" to imply that "'something is being hidden from detection.'"  Villas at Parkside, 726 F.3d at 529 (quoting United States v. Varkonyi, 645 F.2d 453, 459 (5th Cir. 1981)).

Section 1324 also outlines a detailed group of graduated punishments for violations of the statute.  8 U.S.C. § 1324(B)(i)–(iv).  Among other punishments, § 1324(B)(i) mandates that a violation of § 1324(1)(A)(iii)— "knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, conceals, harbors, or shields from detection, such alien in any place" and "in which the offense was done for the

34

purpose of commercial advantage or private financial gain, be fined" or

"imprisoned not more than ten years, or both."  8 U.S.C. § 1324(B)(i).  However,

§ 1324 also creates a safe harbor from prosecution persons and bona fide religious

organizations who "encourage, invite, call, allow, or enable an alien who is present

in the United States" to "perform the vocation of minister or missionary."

Id. § 1324(a)(1)(C).

Section 1324 authorizes both state and local law enforcement officers

to make arrests for § 1324 violations; however, prosecution is exclusively a federal

prerogative with prosecution and interpretation of the federal law handled by the

federal courts.  8 U.S.C. § 1324(c).  The provisions of § 1324 pertaining to

harboring and transporting undocumented aliens are part of a larger statutory

scheme, comprehensively addressing the actions of third parties in aiding and

assisting undocumented aliens.  See Immigration and Nationality Act ("INA"), 8

U.S.C. § 1101 et seq.  Other provisions in the statutory scheme penalize persons

unlawfully bringing aliens into the United States, 8 U.S.C. § 1323(a), and persons

who import for immoral purposes, id. § 1328.

Plaintiffs' field preemption challenge to a state's harboring statute is

not novel.  Several circuit courts have addressed similar state and city harboring

provisions in recent years.  In United States v. South Carolina, the Fourth Circuit

determined that a state harboring and transporting statute was "field preempted

because the vast array of federal laws and regulations on this subject . . . is 'so pervasive . . . that Congress left no room for the States to supplement it.'"  720 F.3d 518, 531 (4th Cir. 2013) (quoting Arizona, 132 S.Ct. at 2501).  The Fourth Circuit held that "[t]he federal government has clearly occupied the field of regulating the concealing, harboring, and transporting of unlawfully present aliens."  Id.

The Eleventh Circuit has also addressed similar state harboring statutes.  In considering Georgia and Alabama's harboring statutes, the Eleventh Circuit held that "Congress has provided 'a full set of standards' to govern the unlawful transport and movement of aliens.  The INA comprehensively addresses criminal penalties for these actions undertaken within the borders of the United States, and a state's attempt to intrude into this area is prohibited because Congress has adopted a calibrated framework within the INA to address this issue." GLAHR, 691 F.3d 1250, 1264 (11th Cir. 2012); United States v. Alabama, 691 F.3d 1269, 1286 (11th Cir. 2012), cert. denied, __U.S.__, 133 S.Ct. 2022, 185 L.Ed. 2d 905 (2013).

The Third Circuit has held that a city's ordinance making it unlawful for a person or business that owns a "dwelling unit" to harbor an illegal alien in the dwelling unit is field preempted by § 1324.  Lozano v. City of Hazleton, 724 F.3d 297, 315 (3rd Cir. 2013), cert. denied __U.S.__, 134 S.Ct. 1491, 188 L.Ed. 2d 375

(2014).  The Court determined that "[t]he INA's comprehensive scheme plainly precludes state efforts, whether harmonious or conflicting, to regulate residence in this country based on immigration status."  Id. (quotation omitted).  The Third Circuit ultimately ruled that the ordinance's housing provisions were "an impermissible regulation of immigration and [were] field preempted because they intrude[d] on the regulation of residency and presence of aliens in the United States and the occupied field of alien harboring."  Id. at 317.

The Ninth Circuit has also addressed the issue.  In a challenge to Arizona's state alien harboring statute, the Ninth Circuit held that "the current version of § 1324 'now presents a single comprehensive "definition" of the federal crime of alien smuggling—one which tracks smuggling and related activities from their earliest manifestations (inducing illegal entry and bringing in aliens) to continued operation and presence within the United States (transporting and harboring or concealing aliens).'"  Valle del Sol, 732 F.3d at 1025 (quoting United States v. Sanchez-Vargas, 878 F.2d 1163, 1169 (9th Cir. 1989)).  The Court further found that "in developing the scheme for prohibiting and penalizing the harboring of aliens, Congress specifically considered the appropriate level of involvement for the states," concluding that "the inference from [§ 1324] is that the role of the states is limited to make arrests for violations of federal law."  Id. (quoting GLAHR, 691 F.3d at 1264).

The Eighth Circuit also addressed a city's ordinance making it unlawful for any person or business or entity to rent to, or permit occupancy by, "an illegal alien, knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of the law." Keller v. City of Fremont, 719 F.3d 931, 938 (8th Cir. 2013), cert. denied __U.S.__, 134 S.Ct. 2140, 188 L.Ed. 2d 1125 (2014). Contrary to the rulings in the Third, Fourth, Ninth, and Eleventh Circuits, the Eighth Circuit created a circuit split, holding that the ordinance was not field preempted because "nothing in an anti-harboring prohibition contained in one sub-part of one subsection of 8 U.S.C. § 1324 [] establishes a 'framework of regulation so pervasive . . . that Congress left no room for the States to supplement it,' or evinces 'a federal interest . . . so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.'" Keller, 719 F.3d at 943 (quoting Arizona, 132 S.Ct. at 2501). The Eighth Circuit reasoned its conclusion on the premise that "[t]he rental provisions do not remove aliens from this country (or even the City), nor do they create a parallel local process to determine an alien's removability." Id. at 942.

Defendants urge the Court to adopt the holding of the Eighth Circuit and find that H.B. 11's harboring provisions are not field preempted. Defendants argue that H.B. 11's harboring provisions regulate only human smuggling, not immigration, and "[a]t most the challenged provisions indirectly impact

unauthorized aliens residing in the State." (Dkt. # 17 at 26–27.) Defendants also attempt to distinguish the lines of cases in the Third, Fourth, Ninth, and Eleventh Circuits finding field preemption, by arguing that none of the laws challenged in those states required an actor to have "the intent to obtain pecuniary benefit," and that the preempted laws in those circuits "covered far more conduct . . . than the provisions challenged here." (Id. at 32.) Based on this, Defendants argue that "[e]ven if there is an 'anti-harboring field' that Congress occupies exclusively, H.B. 11 does not intrude upon it." (Id. at 31.)

        The Court finds the reasoning in the Third, Fourth, Ninth, and Eleventh Circuits field preemption analysis persuasive. Upon careful consideration of the relevant INA provisions pertaining to alien harboring, particularly §§ 1323, 1324, 1327, and 1328, in comparison to H.B. 11's alien harboring provisions—sections 14(a)(2), 15(a), and 16(a)(17), it is clear that Congress created a federal statutory scheme regarding the harboring and transporting of undocumented aliens so pervasive that it left no room in this area for the state of Texas to supplement it. See Gade v. Nat'l Solid Wastes Mgmt. Ass'n, 505 U.S. 88, 98 (1992). Specifically, while Defendants argue that H.B. 11's harboring provisions do not sufficiently concern immigration to constitute preemption, the Court finds that "the scheme governing the crimes associated with the movement of unauthorized aliens in the United States," contained within

§ 1324 and the INA, "provides a 'full set of standards' designed to work as a 'harmonious whole.'"  Valle del Sol, 732 F.3d at 1024–25 (quoting Arizona, 132 S.Ct. at 2501).  "A version of § 1324 has been part of our 'extensive and complex' federal immigration scheme for over a century."  Id. at 1025 (quoting Arizona, 132 S.Ct. at 2499).  The slow evolution of § 1324 "over time demonstrates Congress's intentional calibration of the appropriate breadth of the law and severity of the punishment."  Id.

Additionally, § 1324(c) expressly authorizes state and local law enforcement to "make arrests for a violation of any provision of § 1324," indicating that Congress did not intend states to have a role beyond arresting persons for allegedly harboring unlawful persons.  See 8 U.S.C. § 1324(c); Valle del Sol, 732 F.3d at 1025.  Furthermore, regulation of the harboring of illegal aliens is not an area that is traditionally regulated by a state.  Cf. Ga. Latino Alliance for Human Rights v. Deal, 793 F. Supp. 2d 1317, 1336 (N.D. Ga. 2011) ("[U]nlike concurrent state and federal regulations in other areas, the movement of unauthorized aliens is not a traditional area of state regulation.").

And, contrary to Defendants' contention that H.B. 11's harboring provisions concern only human smuggling and trafficking, whether H.B. 11's harboring provisions are labelled "anti-smuggling" or anti-harboring" is without distinction—the conduct the harboring provisions are attempting to regulate is the

40

same, and that conduct is field preempted by the INA.  Furthermore, Defendants'

arguments against field preemption are not sufficiently distinct from the rulings of

the courts in the Third, Fourth, Ninth, and Eleventh Circuits.  Defendants contend

that none of the challenged laws in those circuits required an actor to have "the

intent to obtain a pecuniary benefit," and that the challenged laws "covered far

more conduct" than section 14(a)(2) of H.B. 11.  (Dkt. # 17 at 32.)  These

distinctions are without merit.  As the Fourth Circuit recognized, "where the

federal government, in the exercise of its superior authority in this field, has

enacted a complete scheme of regulation . . . states cannot, inconsistently with the

purpose of Congress, conflict or interfere with, curtail or complement, the federal

law, or enforce additional or auxiliary regulations."  South Carolina, 720 F.3d at

531 (quoting Hines, 312 U.S. at 66–67).  Because H.B. 11's harboring provisions

do just that, the Court finds Plaintiffs' are likely to succeed on the merits of their

field preemption claim.

> 2.   Conflict Preemption

Even if H.B. 11's harboring provisions are not field preempted, they

are likely conflict preempted.  Plaintiffs contend that H.B. 11's harboring

provisions conflict with federal law because (1) they relocate decision-making

from federal actors to state actors; (2) they impose inconsistent and greater

penalties than § 1324; and (3) they widen § 1324 in certain aspects and narrows it in other aspects.  (Dkt. # 4 at 19–21.)

a.   Decision-Making

Plaintiffs first argue that section 14(a)(2) conflicts with federal alien harboring law by relocating decision-making from federal actors to state actors. (Dkt. # 4 at 19.)  Plaintiffs contend that under section 14(a)(2), state judges—and not federal judges—would make the determination of whether an individual "enter[ed] or remain[ed] in this country in violation of federal law."  (Id.)  Because a state court judge's interpretation of section 14(a)(2) might depart from a federal judge's interpretation of § 1324, Plaintiffs argue that a conflict exists between state and federal jurisdictions that would frustrate federal policy.  (Id.)

Defendants respond that H.B. 11's harboring provisions do not regulate unauthorized aliens or immigration generally, but instead target human trafficking, which is an area of state law that is expressly not preempted by any federal law.  (Dkt. # 17 at 33.)  In such case, Defendants argue that there can be no relocation of decision-making from federal to state authorities and therefore no basis for a finding of conflict preemption.  (Id.)  Defendants further contend that the provisions do not empower any state official to act as an immigration officer or grant them any power to classify non-citizens; instead, they argue that the provisions allow the State to enforce its human smuggling law and concurrently

42

allow federal officials to enforce parallel federal laws on the same subject.  (Id. at 34.)

In 2013, the Fifth Circuit ruled that a city's ordinance criminalizing renting an apartment to a non-citizen "not lawfully present in the United States" was conflict preempted by § 1324.  Farmers Branch, 726 F.3d at 529.  The Court determined that "'the significant complexities involved in enforcing federal immigration law, including the determination whether a person is removable,' reinforce the importance of the federal government's supervisory role over the limited contexts, including harboring, where the Attorney General has delegated arrest authority to state officers."  Id. at 531 (quoting Arizona, 132 S.Ct. at 2506).  In making its ruling, the Fifth Circuit considered the ordinance's prohibition compared to the "analogous crime of transporting certain non-citizens, [where] the "aliens' status is an element of the crime."  Id. (quoting United States v. Alvarado-Machado, 867 F.2d 209, 212 (5th Cir. 1989)).  The Fifth Circuit ultimately concluded that "by criminalizing conduct that does not have the effect of evading federal detection, and by giving state officials authority to act as immigration officers outside the 'limited circumstances' specified by federal law, the Ordinance 'interfere[s] with the careful balance struck by Congress' with respect to the harboring of non-citizens here contrary to law."  Id. (citing Arizona, 132 S.Ct. at 2505–06; Crosby v. Foreign Nat'l Trade Council, 530 U.S. 363, 367 (5th Cir.

43

2000); <u>Odebrecht Constr., Inc. v. Sec'y Fla. Dep't of Transp.</u>, 715 F.3d 1268, 1282–83 (11th Cir. 2013)).

      The Fifth's Circuit ruling in <u>Farmers Branch</u> is instructive.  Here, while the State suggests the target in enacting H.B. 11's harboring provisions focuses on persons who smuggle and traffic unauthorized aliens, the effects of the provisions result in an underlying determination of whether a person has "enter[ed] or remain[s] in this country in violation of federal law."  H.B. 11 § 14(a)(2).  "The federal government alone, however, has the power to classify non-citizens." <u>Farmers Branch</u>, 726 F.3d at 536.  Accordingly, allowing a state official to preliminarily "assess the legality of a non-citizens presence absent a 'preclusive' federal determination, open[s] the door to conflicting state and federal rulings on the question."  <u>Id.</u>  Furthermore, Plaintiffs "'could be unnecessary[ily] harass[ed]' and prosecuted under a law like that here, including individuals 'whom federal officials determine should not be removed.'"  <u>Id.</u> at 546 (Dennis, J. concurring); <u>cf.</u> <u>Arizona</u>, 132 S. Ct. at 2505 ("As a general rule, it is not a crime for a removable alien to remain present in the United States.").

      Overall, the enforcement scheme of H.B. 11's harboring provisions "turns on determinations of whether a noncitizen tenant is or is not 'lawfully present in the United States, a blunt binary classification that is inconsistent with the extensive array of immigration status provided under federal law and with the

complex, often discretionary processes by which the federal government enforces and adjudicates immigration law." <u>Farmers Branch</u>, 726 F.3d at 547 (Dennis, J. concurring).  Furthermore, contrary to Defendants' contention, the Court does not find that state and local law enforcement of H.B. 11's harboring provisions could operate concurrently with "parallel federal laws on the same subject" and thereby avoid conflict preemption.  (<u>See</u> Dkt. # 17 at 34.)  Accordingly, Plaintiffs have shown a likelihood of success on the merits for their first argument regarding conflict preemption.[8]

b.   <u>Penalties</u>

Plaintiffs further contend that H.B. 11's harboring provisions conflict with federal law because they impose inconsistent and often greater penalties upon violators that federal law does not impose.  (Dkt. # 4 at 20.)  Plaintiffs argue that, for instance, H.B. 11's harboring provisions mandate a minimum prison term, but that federal law does not.  (<u>Id.</u>)  Plaintiffs further contend that the state and federal laws escalate penalties differently based on different aggravating factors.  (<u>Id.</u> at 20–21.)

---

[8] It is clear that by labeling H.B. 11's harboring provisions as anti-human trafficking provisions, Defendants attempt to isolate them from the broad realm of federal immigration law.  The Court however must look to the substance and not merely the label of the law in question.  It is clear that the reach of H.B. 11's harboring provisions is far broader than mere human trafficking and it overlaps and intrudes upon the federal immigration laws.

45

In response, Defendants assert that an imposition of additional penalties does not provide a basis for conflict preemption.  (Dkt. # 17 at 35.) Defendants further contend that Plaintiffs have not demonstrated that any differences in penalties will pose a physical impossibility or create an obstacle to federal objectives.  (Id.)  Last, Defendants argue that Plaintiffs ignore the fact that the State is imposing penalties for conduct proscribed by state law, and not imposing penalties for a federal offense.  (Id.)

The Supreme Court has cautioned that "'conflict is imminent' when 'two separate remedies are brought to bear on the same activity.'"  Farmers Branch, 726 F.3d at 529 (quoting Crosby, 530 U.S. at 372).  In this case, § 1324(a)(1)(B)(ii) states that a person who violates the federal alien harboring law shall not be imprisoned more than five years, and § 1324(a)(1)(B)(i) provides that a person who violates the harboring law for "the purpose of commercial advantage or financial gain" shall be imprisoned for not more than ten years.  8 U.S.C. §§ 1324(a)(1)(B)(ii), 1324(a)(1)(B)(i).  By contrast, H.B. 11 § 14(b) provides that the state offense of harboring an alien will result in punishment of a felony of the third degree, constituting a prison term of two to ten years.  See Tex. Pen. Code § 12.34.  The punishments for violations of the state harboring provision are therefore inconsistent with the violations of the federal harboring law condemning the same conduct.  Such inconsistency "intru[des] upon the federal scheme . . . and

46

creates a conflict with the plan Congress put in place." Arizona, 132 S.Ct. at 2503 (recognizing inconsistency in federal and state sanctions for failure to carry registration papers) (citing Wis. Dep't of Indus. v. Gould Inc., 475 U.S. 282, 288–89 (1986)); see Valle del Sol, 732 F.3d at 1027 ("[T]he provision of additional and different state penalties under [Arizona's statute] for harboring unauthorized aliens disrupts 'the congressional calibration of force.'" (quoting Crosby, 530 U.S. at 380)); GLAHR, 691 F.3d at 1267 ("The end result of section 7 is to layer additional penalties atop federal law in direct opposition to the Court's discretion in Crosby."). In such case, Plaintiffs are also likely to succeed on the merits for this contention.

> c.   Widening and Narrowing of Scope

Plaintiffs also argue that H.B. 11's harboring provisions are conflict preempted because they both widen and narrow the scope of the federal offense of alien harboring. (Dkt. # 4 at 21.) Specifically, Plaintiffs allege that § 1324 exempts ministers and missionaries of religious organizations from prosecution, but that H.B. 11 § 14 does not contain such an exemption. (Id.) Plaintiffs further contend that H.B. 11 § 14 provides as an affirmative defense that the harbored undocumented alien is a relative within the second degree of consanguinity or affinity of the alleged violator, but that § 1324 does not provide such a defense.

(Id.)  Because of these actual conflicts in the two statutes, Plaintiffs contend that H.B. 11's harboring provisions are preempted.  (Id.)

Defendants, on the other hand, argue that Plaintiffs' identified differences in the state and federal statutes are insufficient to establish conflict preemption.  (Dkt. # 17 at 36.)  First, Defendants argue that the amended language to H.B. 11 § 14—"with the intent obtain a pecuniary benefit"—specifically exempts religious and charitable organizations from prosecution.  (Id.)  Second, Defendants assert that a small difference in the state and federal harboring laws, such as the state law affirmative defense relating to familial relationship, is only a mere difference that does not result in conflict preemption because it does not make compliance with both laws impossible.  (Id.)

As addressed above in the standing discussion, Plaintiffs all have a realistic threat of prosecution under H.B. 11's harboring provisions.  Because the State law does not have a religious or other similar charitable exemption to prosecution for harboring aliens, Plaintiffs "could be prosecuted for conduct that Congress specifically sought to protect through the exemption."  Valle del Sol, 732 F.3d at 1028.  "By seeking to punish conduct that Congress chose not to punish, the [State] statute clearly poses an obstacle to the accomplishment of the 'full purposes and objectives of Congress," one of which was to protect certain religious activities from prosecution."  Id. (quoting Arizona, 132 S.Ct. at 2501).

With regard to the familial relationship affirmative defense in H.B. 11 § 14(c), this language conflicts with § 1324.  "A local regulation may not—though it may share a common goal with federal law—interfere with Congress's chosen methods."  <u>Farmers Branch, Tex.</u>, 701 F. Supp. 2d at 857, <u>aff'd</u>, 726 F.3d at 524 (citing <u>Chamber of Commerce v. Edmondson</u>, 594 F.3d 742, 766–67 (10th Cir. 2010)).

Accordingly, the Court finds that Plaintiffs are likely to succeed on the merits of their arguments that H.B. 11's harboring provisions are conflict preempted by federal law.

D.   <u>Fourteenth Amendment</u>

Plaintiffs complaint also includes claims that H.B. 11's harboring provisions violate the Due Process and Equal Protection Clauses of the Fourteenth Amendment.  (Dkt. # 9 at 16.)

1.   <u>Due Process</u>

Plaintiffs' amended complaint alleges that H.B. 11's harboring provisions are void for vagueness in violation of the Due Process Clause of the Fourteenth Amendment.  (Dkt. # 9 at 16.)  "'Objections to vagueness under the Due Process Clause rest on the lack of notice and hence may be overcome in any specific case where reasonable persons would know that their conduct is at risk.'"

49

United States v. Clark, 582 F.3d 607, 613 (5th Cir. 2009) (quoting Maynard v.

Cartwright, 486 U.S. 356, 361 (1988)).

   The facial validity of a statute is a question of law.  Vill. of Hoffman

Estates, Inc. v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 494–95 (1982); Ctr.

for Individual Freedom v. Carmouche, 449 F.3d 655, 662 (5th Cir. 2006).  The first

step in evaluating the statute's validity is an over-breadth analysis, which

determines whether the statute reaches a "substantial amount of protected

conduct."  Clark, 582 F.3d at 612.  If it is not overbroad, then the Court must

"examine the facial vagueness challenge and, if the enactment implicates no

constitutionally protected conduct, [the Court] should uphold the challenge only if

the enactment is impermissibly vague in all of its applications."  Hoffman, 455

U.S. at 494–95.

   Plaintiff does not dispute whether H.B. 11's harboring provisions are

overbroad.  See Clark, 582 F.3d at 612 ("[T]he overbreadth doctrine is applicable

only to First Amendment challenges.").  Instead, Plaintiffs challenge whether H.B.

11's harboring provisions are impermissibly vague.  A statute is vague if people of

"common intelligence must necessarily guess at its meaning."  Coates v. City of

Cincinnati, 402 U.S. 611, 614 (1971).  The Fifth Circuit has emphasized that a

statute is not unconstitutional unless it is "impermissibly vague in all its

applications, including its application to the party bringing the vagueness

challenge." <u>Clark</u>, 582 F.3d at 612.  If a reasonable person would know his conduct was covered by the statute, then there has been no failure of notice to that individual.  <u>See</u> <u>Maynard</u>, 486 U.S. at 361.

In light of this framework, the Court is required to examine the actual application of H.B. 11's harboring provisions in this case before engaging in speculation about how the provisions might be applied to other individuals and organizations.  <u>See</u> <u>Roark & Hardee</u>, 522 F.3d at 546.  If Plaintiffs' conduct is clearly covered under H.B. 11's harboring provisions, then Plaintiffs cannot complain as to how others may be affected by the provisions' vagueness.  <u>Id.</u> Additionally, if constitutionally protected conduct is not threatened and the provisions clearly apply to Plaintiffs, then it cannot be void for vagueness.  <u>Clark</u>, 582 F.3d at 613.

The Court finds that Plaintiffs' claim that H.B. 11's harboring provisions are void for vagueness fails under the framework discussed above.  The facts alleged in the amended complaint do not allege that H.B. 11 § 14(a)(2) is vague as applied to Plaintiffs.  In fact, the pleadings allege that the provisions apply to them, and that they "fear imminent prosecution under H.B. 11," for their conduct as specified in the wording of H.B. 11 § 14(a)(2).  (Dkt. # 9 at 15.)  Such conduct lies at the heart of Plaintiffs' case.  Furthermore, the federal anti-harboring law upon which Plaintiff's rely for their preemption claim, § 1324, contains similar

terms as the ones Plaintiffs challenge; however, §1324 has withstood various

vagueness challenges.  See, e.g., Banderas-Aguirre v. United States, 474 F.2d 985,

986 (5th Cir. 1973) ("This Court, as well as other Circuit Courts, have previously

ruled that § 1324 is not unconstitutionally vague.").  Accordingly, Plaintiffs have

failed to state a claim upon which relief may be granted for their due process

claim.

> 2.   <u>Equal Protection</u>

The Equal Protection Clause of the Fourteenth Amendment

commands that no State shall "deny to any person within its jurisdiction the equal

protection of the laws."  U.S. Const. amend. XIV.  The basis of an equal protection

claim therefore is the requirement that all persons similarly situated should be

treated alike.  City of Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 439

(1989); Plyler v. Doe, 457 U.S. 202, 216 (1982); Piotrowski v. City of Houston,

237 F.3d 567, 578 n.15 (5th Cir. 2001).

In analyzing an equal protection challenge, strict scrutiny is

appropriate "only where a government classification implicates a suspect class or a

fundamental right."  Rubee v. Fleming, 160 F.3d 213, 217 (5th Cir. 1998); see City

of Cleburne, 473 U.S. at 440 (holding "when a statute classifies by race, alienage,

or national origin" the law is subject to strict scrutiny).  Otherwise, an equal

protection analysis requires only "that the classification be rationally related to a

legitimate state interest." <u>Cornerstone Christian Sch. v. Univ. Interscholastic</u>
<u>League</u>, 563 F.3d 127, 139 (5th Cir. 2009).

      Defendants move to dismiss Plaintiffs' equal protection claim on the
basis that they fail to identify any equally situated individuals or entities that are
being treated differently.  (Dkt. # 16 at 38.)  Defendants argue that H.B. 11's
harboring provisions treat Plaintiffs the same as anyone who acts "with the intent
to obtain a pecuniary benefit."  (Id.)  In any case, because Plaintiffs challenge to
H.B. 11 does not include any interference with a fundamental right or
discrimination against a suspect class, Defendants assert that the challenged
provisions are valid and should be sustained as rationally related to a legitimate
state interest.  (<u>Id.</u> at 38–39.)

      Plaintiffs, in their response to the motion to dismiss, contend that the
amended complaint asserts a proper equal protection claim because H.B. 11's
harboring provisions criminalize those organizations and individuals who harbor or
shelter undocumented aliens "for pecuniary benefit," but not those organizations
and individuals who gain no pecuniary benefit from the same conduct.  (Dkt. # 22-
1 at 35.)  Because the organizations and individuals are similarly situated, but
treated differently on the basis of whether they gain a pecuniary benefit from their
conduct, Plaintiffs contend that H.B. 11's harboring provisions violate the Equal
Protection Clause.  (<u>Id.</u>)  Plaintiffs argue "there is no rational relationship between

the State's proffered crime-fighting goals in enacting H.B. 11's harboring

provisions and the disparate treatment of certain shelterers." (Id. at 36.)

       As an initial matter, Plaintiffs do not argue that H.B. 11's harboring

provisions implicate a fundamental right or a suspect class. As such, Plaintiff's

constitutional challenge is subject only to a rational basis standard: to be

permissible, the disparate treatment alleged must merely further a "legitimate state

interest." Mass. Bd. of Ret. v. Murgia, 427 U.S. 307, 312 (1976). In applying the

rational basis test at the motion to dismiss stage, a court may go beyond the

pleadings to hypothesize a legitimate governmental purpose. Mahone v. Addicks

Util. Dist. of Harris Cty., 836 F.2d 921, 936 (5th Cir. 1988). However, "the

rational relationship must be real." Id. at 937. "The appropriateness of looking

beyond the pleadings to perform a rational relationship analysis" depends on

(1) "the specific facts pleaded by the plaintiff[,]" (2) "the state of knowledge of the

court making the analysis[,]" and (3) "the complexity of the official action which is

being challenged." Id.

       The Court finds that a rational basis review at the motion to dismiss

stage is appropriate in this case. In conducting the rational basis review, the Court

acknowledges that legislation such as H.B. 11, "that does not employ suspect

classifications or impinge on fundamental rights must be upheld against an equal

protection attack when the legislative means are rationally related to a legitimate

governmental purpose." <u>Hodel v. Indiana</u>, 452 U.S. 314, 331 (1981).  Such laws carry a "presumption of rationality that can only be overcome by a clear showing of arbitrariness and irrationality."  <u>Id.</u> at 331.

In this case, despite being likely preempted by federal law, H.B. 11's harboring provisions are rationally related to their stated purpose of "strengthen[ing] the State's border security measures and help[ing to] stem the rising tide of human smuggling and human trafficking in Texas" by targeting "folks that are engaging in smuggling for financial gain."  (<u>See</u> Dkt. # 16 at 10; Dkt. # 17-14 at 78.)  Because of the substantial deference afforded to governmental actions in a rational basis review, the Court finds that these purposes are both rational and legitimate, and that Plaintiffs have failed to state a violation of their equal protection rights.  Accordingly, Plaintiffs have failed to state a claim upon which relief may be granted for their equal protection claim.

E.    Equitable Factors

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of a preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  <u>Winter v. Nat. Res. Defense Council, Inc.</u>, 555 U.S. 7, 20 (2008).  A preliminary injunction is especially appropriate where, as here, it would "preserve the status quo and prevent allegedly irreparable

injury until the court had the opportunity to decide whether to issue a permanent injunction." Schiavo ex rel. Schindler v. Schiavo, 403 F.3d 1261, 1262 (11th Cir. 2005) (quotation omitted).

Based on the foregoing, Plaintiffs are likely to succeed on the merits of their Supremacy Clause claim. Therefore, the Court must next determine whether Plaintiffs are likely to suffer irreparable harm. "[A]n alleged constitutional infringement will often alone constitute irreparable harm." United States v. Arizona, 641 F.3d at 366; see also Deerfield Med. Ctr. v. City of Deerfield Beach, 661 F.2d 328, 338 (5th Cir. Unit B 1981); Valle del Sol, 732 F.3d at 1029; GLAHR, 691 F.3d at 1269; Arizona, 641 F.3d at 366. In this case, Plaintiffs risk subjection to criminal penalties under laws that might be preempted by federal law and the Supremacy Clause of the United States Constitution. Thus, the Court finds that Plaintiffs are likely to suffer irreparable harm.

The balance of equities in this case also favors Plaintiffs. Any burden to Defendants would be minimal, and an injunction which preserves the status quo would not impose any further burdens on Defendants. In contrast, the burden on Plaintiffs would be great as they possibly face irreparable harm if H.B. 11's harboring provisions continue to be enforced.

Finally, "'it is clear that it would not be equitable or in the public's interest to allow the state . . . to violate the requirements of federal law, especially when there are no adequate remedies available.'"  Valle del Sol, 732 F.3d at 1029 (quoting Arizona, 641 F.3d at 366).  Therefore, it is clear that the public interest weighs in favor of issuing a preliminary injunction.

Accordingly, the Court finds that a preliminary injunction is proper.  The enforcement of H.B. 11 § 14(a)(2), and §§ 15(a), and 16(a)(17)[9] to the extent they incorporate section 14(a)(2), are preliminarily enjoined.  State and local law enforcement officers and officials at all levels have no authorization to investigate, search, seize, arrest, detain, or prosecute anyone based upon sections 14(a)(2), 15(a), and (16)(a)(17) of H.B. 11 while this injunction remains in effect.

V.    Conclusion

Based on the foregoing, the Court **GRANTS** Plaintiffs' Motion for Preliminary Injunction (Dkt. # 3), and **GRANTS IN PART** and **DENIES IN PART** Defendants' Motion to Dismiss (Dkt. # 16).

---

[9] These sections are codified as amended in Tex. Penal Code §§ 20.05, 20.06, 71.02(a).

**IT IS SO ORDERED.**

**DATED**: San Antonio, Texas, April 14, 2016.

_____

David Alan Ezra
Senior United States Distict Judge